UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LEANNE M. STYNCHULA<br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>INOVA HEALTH CARE SERVICES,<br>　　　　　*Defendant*. | No. 1:23-cv-01629-MSN-LRV |
| ADAM NETKO<br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>INOVA HEALTH CARE SERVICES,<br>　　　　　*Defendant*. | No. 1:23-cv-01630-MSN-LRV |
| TIGIST BIRKE<br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>INOVA HEALTH CARE SERVICES,<br>　　　　　*Defendant*. | No. 1:23-cv-01643-MSN-LRV |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendant Inova Health Care Services' ("Inova")

Motions for Summary Judgment in the three above-captioned cases. (ECF 65, 1:23-cv-1629; ECF

64, 1:23-cv-1630; ECF 81, 1:23-cv-1643). The Court will herein grant summary judgment to Inova

in each of these cases.

## I.      BACKGROUND[1]

This case involves the alleged impact of Defendant's (a Northern Virginia hospital and healthcare system) efforts to respond to the COVID-19 pandemic on the free exercise of its employees' religious beliefs. In 2021, Inova added the COVID-19 vaccine to its Immunization Program Policy ("IPP"), rendering it a required vaccine for its employees. Def. Statement of Undisputed Material Facts, ECF 66, 1:23-cv-1629,[2] ("SUMF") ¶ 21. Plaintiffs Leanne Stynchula, Adam Netko, and Tigist Birke—all Inova employees—sought religious exemptions from this requirement, which Inova ultimately denied. Stynchula, Netko, and Birke now seek to recover under Title VII for Inova's alleged failure to accommodate their religious beliefs.

### A.      Inova's COVID-19 Vaccination Requirement

In June 2021, Inova added the COVID-19 vaccine to the IPP list of required vaccinations for its employees. SUMF ¶ 21. Employees were required to receive a COVID-19 vaccination by September 1, 2021, unless they requested and received a medical or religious exemption. *Id.* ¶ 12. Initially, Inova's Team Member Health Department, which administered the IPP and ensured compliance, was empowered to grant exemption requests. *Id.* ¶ 25.

Later, on November 5, 2021, the Centers for Medicare and Medicaid Services ("CMS") issued an interim final rule ("CMS Mandate") that required participating healthcare facilities, including Inova, to ensure that their staff receive the COVID-19 vaccine. *Id.* ¶ 27. Finding that vaccination of healthcare workers against COVID-19 was "necessary for the health and safety of individuals to whom care and services are furnished," and that unvaccinated staff "pose a serious

---

[1]  The following facts are undisputed unless otherwise indicated.
[2]  The parties were ordered to file consolidated briefing on the three Motions for Summary Judgment. (ECF 63, 1:23-cv-1629; ECF 63, 1:23-cv-1630; ECF 80, 1:23-cv-1643). Unless otherwise indicated, and because the briefing in each case is identical, all reference to the relevant Summary Judgment briefing is made with respect to case number 1:23-cv-1629.

threat to the health and safety of patients," CMS required participating facilities to ensure that their

staff received the COVID-19 vaccine. *Id*. ¶ 29 (quoting 86 Fed. Reg. at 61,559, 61,570 (Nov. 5,

2021)). The mandate applied not just to workers in hospital facilities, but also to primarily remote

workers who only periodically interacted in person with healthcare personnel. *Id*. The CMS

Mandate further specified that "[r]equests for exemptions based on an applicable Federal law must

be documented and evaluated in accordance with applicable Federal law and each facility's

policies and procedures." *Id*. ¶ 30 (quoting 86 Fed. Reg. at 61,572).

Inova understood the CMS mandate to require additional documentation of its exemption

decision-making processes. *Id*. ¶¶ 31–35. Inova thus updated its IPP and told its employees that it

would reevaluate medical and religious exemption requests. *Id*. As it related to COVID-19

vaccinations, the IPP required employees to receive "all recommended doses of a Food and Drug

Administration (FDA) authorized or World Health Organization (WHO) listed COVID-19

vaccine." ECF 66-2 at Inova_COVID-19 0003056. When Inova updated the IPP on February 23,

2022, there were three approved vaccines—Pfizer, Moderna, and Johnson & Johnson—that an

employee could take to fulfill the vaccination requirement. *Id*. The policy also clarified, however,

that "[a]ny other vaccine series authorized for [Emergency Use Authorization] by the FDA or

WHO" would satisfy the primary vaccination requirement. *Id*.

When it updated its policies, Inova asked its employees to resubmit exemption requests

using an updated form. SUMF ¶ 32. Those resubmitted requests were then evaluated via a more

robust procedure: they were considered by a multi-disciplinary Religious Exemption Committee

comprised of employees who served as clergy or provided spiritual care, clinical leaders, and

human resources employees. *Id*. The Committee reviewed anonymized requests to determine

whether the applicant had demonstrated a sincerely held religious belief in conflict with the IPP

and voted on whether to recommend Inova grant the exemption. *Id*. ¶ 34. The Committee's recommendation was then shared with the Chief of Clinical Enterprise, the Chief People Officer, and the Chief of Staff, who decided whether to adopt or reject the recommendation. *Id*.

On July 13, 2022, the FDA granted Emergency Use Authorization to the Novavax COVID-19 vaccine, a vaccine that Novavax represented was not developed using fetal cell lines. *Id*. ¶ 40. Accordingly, Inova recognized that Novavax might appeal to individuals with religious concerns about the prior FDA-authorized COVID-19 vaccines because Novavax did not use fetal cell lines in its development. *Id*. Novavax stated to Inova that "[n]o human fetal-derived cell lines or tissue are contained in the Novavax COVID-19 Vaccine … or used in its development, manufacture or release testing." ECF 66-8 at Inova_COVID-19 0000252. Inova relayed this information to its employees in an August 5, 2022 "Novavax COVID-19 Vaccine Overview" later sent by email and also uploaded to Inova's COVID-19 Team Member Resources Page. SUMF ¶¶ 44–45. Inova also updated its IPP Team Member Frequently Asked Questions on August 16, 2022, notifying employees of Novavax's availability and explaining that it was not developed using fetal cell lines. *Id*. ¶ 46.

## B.    Plaintiff Adam Netko

Inova hired Adam Netko as a Senior Technical Specialist in June 2014. *Id*. ¶ 47. Prior to the COVID-19 pandemic, Netko occasionally worked on-site at Inova facilities, although during the pandemic, he worked remotely from his home in North Carolina. *Id*. ¶ 48. On August 6, 2021, following Inova's June 2021 COVID-19 vaccination requirement, Netko requested a religious exemption. *Id*. ¶ 57. He stated that the "COVID-19 vaccine goes against my sincerely held religious and Christian beliefs" and provided an undated, unsigned letter attributed to his pastor stating that "[Netko]'s faith establishes a firmly held religious conviction against . . . all [] vaccinations derived from the research and/or use of aborted human tissue" and that it was "[our]

4

[belief] to protect the physical integrity of our body against unclean food and injections." *Id*. ¶ 58. Inova's TMH approved Netko's exemption on August 9, 2021. *Id*. ¶ 59.

On March 23, 2022, after Inova updated its IPP following the CMS mandate, Netko made another religious exemption request. *Id*. ¶ 60. Netko objected to the COVID vaccines because they "used cell lines originating from aborted children in their manufacturing or testing," which was a belief that he had held for his "adult life" and was "reaffirmed . . . after being born again in 2020." *Id*. ¶ 61. He also "object[ed] to all other drugs or medications that were researched, developed, or tested in their origin using fetal cell lines from aborted babies . . . ." *Id*. Inova denied Netko's request on May 13, 2022, and gave him until May 27, 2022 to comply with the IPP. *Id*. ¶ 62. Although Inova advised Netko that he could submit additional information for consideration, he did not do so. *Id*. ¶ 63. Netko was placed on administrative leave on May 28, 2022, and after he failed to initiate the vaccination process, Inova ended his employment on June 22, 2022. *Id*. ¶ 65.

### C.    Plaintiff Leanne Stynchula

Inova first hired Leanne Stynchula in February 1996 and later re-hired her in July 2016 as a Home Health Liaison Nurse. *Id*. ¶¶ 103–105. She transferred to a post-partum nurse position in 2018 and worked part-time at Inova Alexandria Hospital. *Id*. ¶ 106. On August 4, 2021, after Inova instituted its June 2021 COVID vaccination requirement, Stynchula requested a religious exemption, stating that she had not received a vaccine in 30 years and believed that "my body is a gift from God. I do not believe in injecting foreign substances unless there is a therapeutic reason for me to receive them." *Id*. ¶ 115. Also included was a letter from a Scientologist Chaplain discussing "injection of a foreign substance into her body" and the "axiom" of "Self Determinism." ECF 66-8 at Inova_Stynchula 0000874. Inova's TMH granted this exemption request.

After Inova updated its IPP following the CMS mandate, Stynchula submitted another religious exemption request on March 23, 2022, and subsequently resubmitted this request with additional information after the administrator of Inova's exemption request email box asked her to reformat her responses. SUMF ¶¶ 117–118. She stated in her resubmitted request that she believed "[t]aking this vaccine or any vaccine would impact my relationship with God. I feel it would be a sin, as it goes against my deeply felt convictions and the answers I have received in prayer." *Id*. ¶ 119. She also noted that she decides whether to take medications by "read[ing] the entire insert and pray[ing] about it." *Id*. Inova denied this exemption request on June 28, 2022, and informed Stynchula that she needed to initiate vaccination by July 12, 2022, but also that she could submit additional information for consideration. *Id*. ¶ 120.

Stynchula submitted additional information to Inova's REC on July 12, 2022. *Id*. ¶ 121. This included discussion of The Creed of the Church of Scientology and quotations from the Christian Bible. *Id*. ¶ 122. Stynchula stated that she "must honor God with my spirit, mind, and boy, and therefore I must guard what I put into my body. That includes avoiding, whenever possible, knowingly receiving foreign toxins with harmful or unknown effects . . . ." *Id*. She also objected specifically to the Moderna, AstraZeneca, and Johnson & Johnson COVID-19 vaccines based on the use of "aborted fetal tissue" in the "development, production, and lab testing" of the latter two and the "testing process" in the former two. *Id*. ¶ 123. Stynchula had not raised any concerns about fetal cell lines in her three prior religious exemption requests. *Id*.

On August 5, 2022, Inova informed Stynchula that her exemption request had been denied and that she had until August 19, 2022, to initiate COVID-19 vaccination. *Id*. ¶ 124. That same day Inova also sent Stynchula its Novavax Overview, informing her of Novavax's availability and that fetal cell lines were not involved in Novavax's development, manufacture, or testing. ECF 81-

8 at Inova_COVID-19 0000252; SUMF ¶¶ 45, 125. Stynchula reviewed Inova's Overview and

was aware that Novavax would fulfill Inova's COVID-19 vaccination requirement. SUMF ¶ 126;

ECF 66-7 at Ex. 64 117–119. She did not, however, contact anyone at Inova for more information

on Novavax. SUMF ¶ 126. On August 17, 2022, Inova once again notified Stynchula that the

Novavax vaccine was available and that it did not involve fetal cell lines in its manufacture,

development, or testing. *Id*. ¶ 128. On August 30, 2022, Inova placed Stynchula on administrative

leave for failure to comply with its COVID-19 vaccination requirement, and her last day of

employment at Inova was September 8, 2022. *Id*. ¶¶ 129–30.

### D.    Plaintiff Tigist Birke

Inova hired Tigist Birke in October 2020 as a nurse in its Post-Anesthesia Care Unit at

Inova Alexandria Hospital. *Id*. ¶ 74. On August 14, 2021, following Inova's June 2021 COVID-

19 vaccination requirement, Birke submitted an exemption request. *Id*. ¶ 77. The indicated reason

for this exemption request was that she was breastfeeding. *Id*. However, this request was denied

because Birke failed to provide a letter from her healthcare provider. *Id*. ¶ 78. On August 31, 2021,

Birke submitted a religious exemption request for the first time. *Id*. ¶ 79. This request included

several Bible verses, her belief that her blood "must remain pure" and unchanged, and a letter from

her Church certifying her membership. *Id*.; ECF 66-5 at INOVA_Birke 0001731. Inova's TMH

granted her religious exemption request the same day it was filed. SUMF ¶ 80.

On March 25, 2022, after Inova revised its IPP following the CMS mandate, Birke

submitted a new religious exemption request, which differed in material respects from her initial

exemption request. *Id*. ¶ 81. Among other things, her March 25 request objected to the COVID-19

vaccine because "most vaccines are made out of or tested using aborted fetal organs or cells and

cell lines," adding "[i]t is a total abomination to participate in this inhuman and disgraced act as a

Christian. I believe, according to scripture, that life begins on conception." *Id*. ¶ 83; ECF 66-5 at Inova_Birke 0000897.

Inova denied Birke's March 25, 2022 religious exemption request on July 2, 2022 and gave her until August 4, 2022 to comply with the IPP. SUMF ¶¶ 87–88. Birke was invited to submit additional information in support of her exemption request. *Id*. ¶ 88. Before Birke did, she asked to see the appeal letter that a colleague had submitted and stated to the colleague: "My only intention is to buy me sometime until [sic] decide where to go." *Id*. ¶ 89; ECF 66-6 at Ex. 53. Birke retained attorney Isaiah Kalinowski on August 1, 2022, who wrote her an appeal letter that did not contain any new information about her religious convictions or practice but rather summarized her beliefs. SUMF ¶¶ 90–91. Birke submitted the Kalinowski letters to Inova as her appeal on August 4, 2022. *Id*. ¶ 92. While her appeal was still pending, Birke interviewed for a new job with Virginia Hospital Center ("VHC"). *Id*. ¶ 93.

Inova notified Birke on August 17, 2022 that the Novavax COVID-19 vaccine was available and that it did not involve fetal cell lines in its manufacture, development, or testing. *Id*. ¶ 94. Birke's appeal was denied two days later on August 19, 2022, and she was informed that she had until September 2, 2022 to initiate vaccination or she would be placed on a seven-day administrative leave and terminated if she did not begin vaccination. *Id*. ¶ 97. On September 9, 2022, Inova informed Birke of her noncompliance with the IPP and stated that she had until September 20, 2022 to initiate vaccination or she would be placed on unpaid leave. *Id*. VHC formally offered Birke a nursing position on September 16, 2022. *Id*. ¶ 98. On September 27, 2022, Inova Human Resources Business Partner Scott Tippett and Birke's manager Mireille Malkoun spoke with Birke regarding the availability of Novavax as an option to comply with the IPP without compromising her beliefs about the use of fetal cell lines. *Id*. ¶ 100. Tippett also sent her a follow-

up email with more information about Novavax. *Id.* Birke did not respond. *Id.* ¶ 101. Birke's employment with Inova ended effective September 30, 2022. *Id.* ¶ 102.

### E.      Procedural History

Each plaintiff sued Inova individually, claiming Inova's refusal to grant them exemptions to the IPP constituted religious discrimination in violation of Title VII (on failure to accommodate and disparate treatment theories) and the Virginia Human Rights Act ("VHRA"). Inova moved to dismiss all claims. ECF 5, 1:23-cv-1629; ECF 5, 1:23-cv-1630; ECF 4, 1:23-cv-1643.

The Court granted in part and denied in part Inova's motions. ECF 14; 1:23-cv-1629; ECF 16, 1:23-cv-1630; ECF 15, 1:23-cv-1643. Specifically, the Court dismissed Plaintiffs' Title VII disparate treatment and VHRA claims, but permitted the Title VII failure to accommodate claims to proceed in part, "only to the extent [they are] based on Plaintiff[s'] sincerely held religious objections to the use of fetal cells in the development of Covid-19 vaccines." *Id.*

Inova now moves for summary judgment on Plaintiffs' surviving Title VII failure to accommodate claims. ECF 65, 1:23-cv-1629; ECF 64, 1:23-cv-1630; ECF 81, 1:23-cv-1643.

## II.    LEGAL STANDARDS

Under Title VII, covered employers may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is therefore "an unlawful employment practice . . . for an employer to fail to reasonably accommodate the religious practices of an employee." 29 C.F.R. § 1605.2(b)(1).

To prevail on a Title VII failure-to-accommodate claim, a plaintiff must first prove that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to

comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996). "If the employee establishes [such] a prima facie case, the burden then shifts to the employer to show that it could not reasonably accommodate the plaintiff's religious needs without undue hardship." *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (citation omitted).

A movant is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the Court "must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* "Under this standard 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.   ANALYSIS

The remaining failure-to-accommodate claims at issue in these cases are grounded in Plaintiffs' claimed religious objections to abortion—and, more specifically, the use of medications derived from fetal cell lines. *See Supra* § I.E. Inova has moved for summary judgment on several grounds, all related to Plaintiffs' ability to establish a *prima facie* case. With respect to Netko, Inova argues that (1) he cannot bring his Title VII claim in this Court because he failed to exhaust his administrative remedies, and (2) the exemption request he provided to Inova did not assert sincerely held beliefs. ECF 66 at 31, 38. Regarding Stynchula, Inova argues that (1) the exemption request she provided to Inova did not assert sincerely held religious beliefs, and (2) there was no

conflict between her communicated beliefs and Inova's vaccination requirements once Novavax became available. *Id*. at 43, 51. And as to Birke, Inova argues just that there was no conflict between her communicated beliefs and Inova's vaccination requirements once Novavax became available. *Id*. at 47.

Upon review of the record, the parties' briefs, and the parties' presentation of oral argument, the Court finds that Inova is entitled to summary judgment as to all three Plaintiffs' claims: Netko's because there is no genuine dispute of material fact regarding the sincerity of his religious beliefs;[3] Stynchula's because there is no genuine dispute as to whether her objections to the COVID vaccines were secular rather than religious in nature, and because her abortion-related objections were not sincerely held; and, separately, both Stynchula and Birke's claims because there is no dispute that availability of the Novavax vaccine eliminated any conflicts between Inova's policies and their abortion-related concerns.

### A.      Netko's Exemption Requests Did Not Assert Sincerely Held Beliefs.

Inova argues that Netko's claim fails because his requests for religious exemptions from the COVID vaccine requirement did not assert beliefs that he sincerely held. The Court agrees.

To be entitled to a religious accommodation under Title VII, a plaintiff must provide sufficient evidence to show that his stated beliefs are both sincerely held and, in his own scheme of things, religious in nature. *See U.S. E.E.O.C. v. Consol Energy, Inc*., 860 F.3d 131, 142–43 (4th Cir. 2017); *Welsh v. United States*, 398 U.S. 333, 339 (1970). Although the validity, reasonableness, or "the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held,'" which is "the threshold question of sincerity which must be resolved in every case." *United States v. Seeger*, 380 U.S. 163, 185 (1965); *see also E.E.O.C. v.*

---

[3] Because the Court resolves Netko's case on these grounds, it does not address Inova's arguments concerning Netko's administrative exhaustion.

*Ilona of Hungary, Inc*. 108 F.3d 1569, 1575 (7th Cir. 1997) ("[I]f the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a *religious* observance or practice that conflicts with an employment requirement."). "[This] requirement . . . is critical to the effective functioning of civil society and to the respect in which religion is rightly owed in civil society." *Gardner-Alfred v. Fed. Reserve. Bank of N.Y.*, 2023 WL 6214863, at \*13 (S.D.N.Y. Sept. 25, 2023). "To be sure, assessing the bona fides of an employee's religious belief is a delicate business" and is a factual inquiry of credibility ordinarily reserved for the factfinder at trial rather than the court at summary judgment. *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002). But it is also the defendant's "entitle[ment] to hold the plaintiff to his burden, making it entirely appropriate, indeed necessary for a court to engage in analysis of [] sincerity," *id*. (cleaned up), and the court's duty to "actively engage with [a plaintiff's] requirement to provide 'specific, material facts'. . . and to avoid 'conclusory allegations and denials' in analyzing the arguments of the parties." *Sedar*, 988 F.3d at 761 n.3.

Bearing these principles in mind, the Court finds that Netko has failed to carry his burden to show a genuine issue of material fact as to whether his religious opposition to Inova's COVID-19 vaccine requirement was sincerely held. Netko informed Inova that his objection was based on the vaccines' use of "cell lines originating from aborted children in their manufacturing and testing," a belief stemming from his religious views on abortion that he had held for his "adult life" and which were "reaffirmed" when he was "born again in 2020." SUMF ¶ 61. Netko also told Inova that he objected to "all other drugs or medications that were researched, developed, or tested in their origin using fetal cell lines from aborted babies." *Id*. But, as required by Inova, Netko received vaccines for TDAP (as recently as May 2016), MMR (which used fetal cell lines in

development, taken as recently as July 2020, after the time Netko claims he was born again), and the flu (as recently as October 2021). *Id*. ¶ 50. He never sought a religious exemption from Inova for any vaccine or other reason prior to the COVID-19 vaccine, explaining simply that he "did not feel the need to." ECF 66-3 at Def. Ex. 22 pp. 49–50. In June 2022 (after making his March 2022 Inova exemption request), he completed a Health History Questionnaire from his primary care physician, answering "no" to whether there were "any religious or cultural factors that you would like us to take into account when planning your healthcare." SUMF ¶ 53. And he took numerous prescription and over-the-counter medications that were developed, manufactured, and/or tested using fetal cell lines before, during, and after he sought a religious exemption on such grounds, including as recently as one month prior to his August 2024 deposition. *Id*. ¶¶ 51–52. These facts paint a clear picture: both before and after objecting to Inova's COVID-19 vaccine policy, Netko's practice with respect to medicines and vaccines developed using fetal cell lines "[was] inconsistent. He puts some medicines in his body, but not others" and thus he has severely contradicted his assertion that he could not receive a COVID-19 vaccine without compromising his religious beliefs. *Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412, 418 (E.D. Pa. 2024) (granting employer summary judgment on similar claim).

Netko rejects this conclusion in several ways, none of which is compelling. He argues that Inova cannot show that he subjectively knew of the involvement of fetal cells in the medications and vaccinations that he received, when he received them, and because "sincerity is a subjective question pertaining to the party's mental state," if Netko received them ignorant of the fact of fetal cell involvement, "that is not behavior that is markedly inconsistent with his stated beliefs." ECF 77 at 34–35. But there is no rule that a subjective mental state cannot be proven by objective circumstantial evidence. *See Hager v. Secretary of Air Force*, 928 F.2d 1449. 1459 (1st Cir. 1991)

(noting that evaluation of beliefs for sincerity is "essentially a factual determination . . . [t]he decisionmakers look for objective evidence in the record that would undermine the applicant's avowed [religious] belief"); *Union Independiente*, 279 F.3d at 56 ("Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity."). Indeed, in *Gardner-Alfred*, the court noted that a plaintiff, who objected to COVID vaccination for fetal cell connections but took "many" medications and injections over ten years (before and after seeking a COVID exemption) without checking if they were made with fetal cell lines, undermined her claim to a "genuine" religious fetal cell objection when she "did not even inquire–and has no memory of ever learning–whether a medication she was taking" had such connections. 2023 WL 6214863, at *17. Like Netko, she claimed that she could take any medication as long as she did not know of its fetal cell connections. *Id*. And like Netko, who says that he would not have taken the medicines and injections had he known of their fetal cell associations, she "offer[ed] no explanation why, if she ha[d] a genuine religious objection to the vaccine because of its content . . . she never asked . . . about the content of any other medication." *Id*. That Netko frequently and unquestioningly accepted substances that transgress his apparent beliefs obviates any dispute as to whether his beliefs are "truly held." *Seger*, 380 U.S. at 185.

That Netko was "born-again" in 2020 does not change the analysis, as he states that he was "[b]orn and raised a Catholic," remained a part of the Catholic Church until 2020, and, most critically, held his beliefs concerning vaccination and abortion "[f]or my adult life," simply "reaffirm[ing]" them in 2020. SGMDF ¶ 7. That is, the relevant beliefs he claims are not new, and yet they were not well observed after Netko made his religious exemption requests and especially not before. Netko also contends that his failure to consistently raise fetal cell objections is of no

consequence because "a finding of sincerity does not require perfect adherence to beliefs expressed by the [plaintiff], and even the most sincere practitioner may stray from time to time." *Moussazadeh v. Tex. Dept. of Crim. Just*, 703 F.3d 781, 791–92 (5th Cir. 2012) (citing *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012)). But for a self-declared life-long adherent of a belief, like Netko, such a principle does not mean that sincerity is evident when he strays *one hundred percent* of the time until one day, he ostensibly decides to outwardly manifest his belief.[4]

While no one contends that Netko is not a Christian or does not hold religious beliefs in general, no reasonable juror could conclude that his objection to the COVID-19 vaccine sincerely arises out of those beliefs. Rather, Netko's assertion that his religion prevented him from taking such vaccines "appears to have been newly adopted only in response to the demand that [he] take the COVID-19 vaccine," *Gardner-Alfred*, 2023 WL 6214863, at *17, which is consistent with his general hostility to authority with respect to the COVID pandemic as a whole. *See* SUMF ¶ 56, ECF 66-4 at Def. Ex. 31. Without reaching the religiosity of his beliefs, it is enough to observe that Netko "offers no evidence other than [his] own say-so" to support his assertion of sincerity. *Gardner-Alfred*, 2023 WL 6214863, at *18. This is insufficient as a matter of law.

### B.    Stynchula's Exemption Requests Did Not Assert Sincerely Held or Religious Beliefs.

Inova asserts that Stynchula's claim must fail because her vaccine exemption requests reflect beliefs that are secular, rather than religious, in nature. As the Parties' relevant arguments touch on both the religiosity of Stynchula's objections, as well as the sincerity of her fetal cell line opposition to COVID-19 vaccines, the Court will address these issues separately. There can be no

---

[4] *Ilona of Hungary* is not in conflict with this principle, as Netko suggests. ECF 77 at 36. There, the Seventh Circuit agreed that the plaintiff was sincere where she admitted she was "not a particularly religious person" and "does not observe every Jewish holiday" but due to religious revival, began attending services on Yom Kippur several years *before* making a (rejected) request to take the holiday off from work. 108 F. 3d at 1575. Netko can point to no such prior practice.

dispute that Stynchula's reasons for refusing the COVID vaccines are secular, not religious, in nature, and that her fetal cell line opposition to the COVID vaccines is not sincerely held.

### 1.  Stynchula's Beliefs Are Secular, Not Religious in Nature.

"Whether one's beliefs and practices are religiously motivated is sometimes a difficult question for courts of law to decide." *Doswell v. Smith*, 139 F.3d 888, at *3 (4th Cir. 1998) (Table). Courts must avoid any "predisposition toward conventional religions" to ensure that unfamiliar or unconventional beliefs are not incorrectly labeled as "secular." *Id.* (citing *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)). "A system of religious beliefs, however, is distinct from a way of life, even if that way of life is inspired by philosophical beliefs or other secular concerns." *Versatile v. Johnson*, 2011 WL 5119259, at *4 (E.D. Va. Oct. 27, 2011) (internal quotation omitted). Thus, in determining whether an employee's beliefs are religious in nature, courts analyze whether the beliefs in question (1) "address fundamental and ultimate questions having to do with deep and imponderable matters," (2) are "comprehensive in nature," and (3) "are accompanied by certain formal and external signs." *Africa*, 662 F.2d at 1032.

Stynchula has not presented facts that show her vaccine-related beliefs are religious. Because the Court permitted her claim to proceed "only to the extent [it is] based on [her] sincerely held religious objections to the use of fetal cells in the development of Covid-19 vaccines," ECF 14, 1:23-cv-1629, Stynchula's fetal cell line beliefs are the only appropriate focus of the inquiry at summary judgment. First, Stynchula's Scientological beliefs are irrelevant to this focus. She states that her fetal cell line objections are grounded in her Catholic upbringing, whereas she joined the Church of Scientology in 2001. ECF 77-2 at Pl. Ex. 20 pp. 67, 167. And, the connection between her Scientological beliefs and her vaccination objections is undeveloped except to the extent that she objected to COVID vaccinations as "foreign substances" on the basis of the "axiom" of "Self Determinism" starting in August 2021 (ECF 66-8 at Inova_Stynchula 0000874,

Inova_Stynchula 0000892) and the idea that "the spirit alone may save or heal the body" in July 2022.[5] (ECF 66-8 at LS 000031). But these simply "seek[] a religious objection to any requirement with which [Stynchula] disagrees" and do not concern religious beliefs. *DeVore v. University of Kentucky Board of Trustees*, 693 F. Supp. 3d 757, 763 (E.D. Ky. 2023), *aff'd* 118 F.4th 839 (6th Cir. 2024). They are, rather, "isolated moral teaching[s]" in lieu of a "comprehensive system of beliefs about fundamental or ultimate matters."[6] *Id*. (citing *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d, 458, 465–66 (M.D. Pa. 2022) (rejecting "God given right to make her own choices")); *see also Wright v. Honeywell Int'l Inc.*, 2024 WL 2963460 (M.D. La. June 12, 2024) ("reference to freedom of choice issues . . . evinces essentially legal, as opposed to religious, concerns"). Finding Stynchula's objection to be religious on these grounds "would amount to a blanket privilege and a limitless exclude for avoiding all unwanted obligations . . . denigrat[ing] the 'very concept of ordered liberty.'" *DeVore*, 693 F. Supp. 3d at 763 (citing *Finkbeiner*, 623 F. Supp. 3d at 463; *Africa*, 662 F.2d at 1031); *see also Foshee v. AstraZeneca Pharmaceuticals LP*, 2023 WL 6845425, at *4 (D. Md. Oct. 17, 2023) ("Ultimately, beliefs amounting to a declaration that an employee has the right to make unilateral decisions do not constitute religious beliefs, even where religion is expressly invoked in communicating the beliefs.")

---

[5] While in her brief, Stynchula argues that she also stated her viewing of information about vaccinations and medications was a function of her Scientologist beliefs, she cites her declaration (that must be disregarded because it was not included in the record, *see* ECF 84 at 23; Fed. R. Civ. P. 56(c)(1)(A)) for this proposition and nowhere else does the record support such a statement. ECF 77 at 30. And, while Stynchula's brief obliquely suggests that her fetal cell line objection is also rooted in Scientology by way of her "foreign toxin" concern, *see id.*, this too is unsupported. Her first three exemption requests did not mention fetal cell lines and opposed "foreign substances" on the basis of self-determinism. Her July 12, 2022 appeal provided that the Scientologist idea that 'the spirit alone may save or heal the body" "specifically addresses the reason I cannot in good conscience receive any of the COVID shots or any other vaccination," dispelling any notion that her fetal cell line objections (raised separately in her July 2022 appeal) arise from Scientology. ECF 66-8 at LS 000030, LS 000031.

[6] This is true of Stynchula's nonspecific reliance on the Creed of the Church of the Scientology in general. ECF 66-8 at LS 000030, LS 000031.

Relatedly, Stynchula's statements and conduct "only reinforce[] that her opposition stems from her medical beliefs." *Finkbeiner*, 623 F. Supp. 3d at 466. She believes that her "body is a gift from God" and objects to vaccinations because "[she] do[es] not believe in injecting foreign substances unless there is a therapeutic reason" (August 2021 request) and because they would "impact [her] relationship with God" and "would be a sin, as it goes against [her] deeply felt convictions and the answers [she] ha[s] received in prayer" (March 2022 requests). SUMF ¶¶ 115, 119. She "must honor God with [her] spirit, mind, and body, and therefore [] must guard what [she] put[s] into [her] body. That includes avoiding, whenever possible, knowingly receiving foreign toxins with harmful or unknown effects." SUMF ¶ 122 (July 2022 supplement). These objections are not cognizable as religious because "it would be a step too far to count everything [Stynchula] believes about healthy living as a religious practice." *Finkbeiner*, 623 F. Supp. 3d at 466 (citing *Geerlings v. Tredyffrin/Easttown School District*, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021)). More to the point, Stynchula herself does not actually regard these concerns as religious. She says she weighs whether to take medications by "read[ing] the entire insert and pray[ing] about it." SUMF ¶ 119 (March 2022 requests). Specifically, she "always read[s] the package inserts and I try to figure out why I'm taking it and see what my options are. And I look at what the potential other effects are of any medication and do my own little pros and cons list." ECF 66-7 at Def. Ex. 64 pp. 64–65; *see also id*. at Def. Ex. 64 p. 58–59 ("I've read the inserts in the packaging, and I don't think that many of the diseases you're vaccinated against are as harmful as the potential side effects that you could get from the vaccines."). After looking at the insert, which describes the insert as "the research and the side effects and the effects of the medications" Stynchula asks herself, "is this worth that risk[?]" *Id*. at Def. Ex. 64 pp. 64–65.

This approach—one based on medical research and potential side effects—was how she considered the COVID vaccines: she wanted to see the inserts because "I couldn't figure out what preservatives are in it, what carrier content is really there" and she was concerned that she could be receiving something harmful if she took a COVID vaccine without such information.[7] *Id*. at Def. Ex. 64 pp. 113–14.

While Stynchula argues that her inquiry is akin to a Mormon examining an ingredients list for the inclusion of caffeine or a Muslim doing the same for pork or haram foods (ECF 77 at 33), that comparison is inapposite: Stynchula does not review medication and vaccine information with an eye towards religious mandates or prohibitions. That is, her search is not to ensure that a specific substance is not present in her medications, or that certain religious procedures have been followed. She simply engages in a cost-benefit analysis of vaccines and medications rooted in her personal concerns over their safety and efficacy. Attaching a gloss of "general moral commandment[s]," such as beliefs in personal liberty or that the body is a temple, to these concerns cannot alone render them religious. *Fallon v. Mercy Catholic Ctr. of Se. Pa.*, 877 F.3d 487, 492 (3d Cir. 2017) (citing *Africa*, 662 F.2d at 1032) (objection to flu vaccine because it "may do more harm than good" was a "medical belief" not be made religious by application of the principle "Do not harm your own body").

Stynchula's July 12, 2022 supplemental objections to the use of "aborted fetal tissue" in the "development, production," and / or "testing" of the COVID vaccines cannot resuscitate her claim. SUMF ¶ 123. Stynchula did not identify any abortion-related concerns in her first three exemption requests. *Id*. Stynchula's aforementioned medical beliefs lend no support to and are not

---

[7] Relatedly, Stynchula believes that the "CDC exaggerated the danger of COVID-19 for individuals who do not have comorbidities or are immunocompromised" and that the "CDC exaggerated the efficacy of the COVID-19 vaccines." ECF 66-7 at Def. Ex. 64 p. 51. This is consistent with her interest into the benefits and detriments of the COVID-19 vaccines and vaccines and medications in general.

made religious by virtue of her last-minute fetal cell line contentions. The crux of Stynchula's argument to the contrary lies with her apparent deposition testimony that her avoidance of "foreign toxins with harmful or unknown effects" "directly applies to my pro-life stance and the fetal cell argument because I believe that abortion is murder when it's elected. And there were cells used from an elective abortion. So in my personal opinion, I am then supporting that murder." ECF 66-7 at Def. Ex. 64 p. 112. That is, she attempts an incorporation by reference of her fetal cell concerns to her earlier, more generalized exemption requests. *See* ECF 77 at 29. To begin with, it is not clear that Stynchula even post-hoc connected the idea of foreign toxins with fetal cell lines during her deposition.[8] But even crediting her account of that testimony, a tie between her medical beliefs and abortion is completely contradicted by the record evidence. It is worth remembering that Stynchula previously objected to "injecting foreign substances unless there is a *therapeutic* reason" and on the basis of "*Self Determinism*," not fetal cell lines. SUMF ¶ 115; *see supra* note 5 and accompanying discussion. And Stynchula's accounts of her fact sheet inquiry eschew any mention or consideration of abortion or fetal cell lines and nothing else in the record supports her contentions.[9] Her deposition assertion that she sought out the Novavax vaccine "insert" or fact sheet to ascertain the vaccine's fetal cell line connections is similarly refuted. ECF 66-7 at Def. Ex. 64 pp. 120. There is no record evidence that Stynchula has ever investigated vaccines or medicines with an eye to their fetal cell line associations—to the contrary, she was interested in the "preservatives" and "carrier content" of the other COVID vaccines and feared receiving

---

[8] At Stynchula's deposition, Inova's counsel asked her "What about [her July 12, 2022 foreign toxins statement] applies to the COVID vaccine?" Stynchula then cited her "pro-life stance and the fetal cell argument." Inova's counsel then stated "Okay, I want to go back. I think that's the next paragraph," to which Stynchula replied "Okay." Inova counsel clarified "[t]his is about the 'knowingly receiving foreign toxins,'" to which Stynchula began discussing the COVID vaccine inserts. ECF 66-7 at Def. Ex. 64 pp. 112, 113.

[9] In her July 2022 exemption appeal, Stynchula also framed her "foreign toxins" concerns separately from her fetal cell line concerns. *See* ECF 66-8 at LS 000031 (stating "I must honor God . . . and therefore I must guard what I put into my body. This includes avoiding, whenever possible, knowingly receiving foreign toxins" and then addressing in a new paragraph "It is *also* my sincere religious conviction that human life begins at conception . . .").

something harmful from them. *Id*. at Def. Ex. 64 pp. 113–14. On all of this, there can be no genuine issue as to the secular nature of Stynchula's vaccination objections.

### 2. Stynchula's Fetal Cell Opposition to COVID Vaccination Is Not Sincere.

Separate from religiosity, there is also no dispute of material fact as to whether Stynchula's fetal cell line beliefs were sincerely held. *See Gardner-Alfred*, 2023 WL 6214863, at *16 ("Her claim . . . turns upon the sincerity of her belief in "[t]he specific religious practice."). Stynchula says that these beliefs were life-long and arise out of her Catholic faith, ECF 66-7 at Def. Ex. 64 pp. 167–68, which is the faith that she grew up in and still considers to be the foundation of her religion. ECF 77-2 at Pl. Ex. 20 p. 67. She also asserts that her objection was the reason she worked as a post-partum nurse rather than in labor and delivery. ECF 77-2 at Pl. Ex. 20. But she does not dispute that she did not raise fetal cell line objections in her August 2021 COVID-19 vaccine exemption request, nor in either of her March 2022 requests. *See* ECF 77-3 at Pl. Ex. 22; ECF 66-7 at Def. Ex. 64 p. 167; ECF 73, 75, 76. This was despite her knowing in March 2022 that the then-available COVID-19 vaccines were developed or tested on fetal cell lines. ECF 66-7 at Def. Ex. 64 p. 115. And while she repeatedly states she has not received *any* vaccines for 30 years (*See, e.g.*, SUMF ¶ 115), she has not presented any evidence that she ever objected to other vaccines or medicines on abortion-related (as opposed to health-related) grounds. The fact that Stynchula raised her fetal cell line objection only with her final exemption appeal is a textbook example of "timing [that] renders [the request] suspect." *See* EEOC Compliance Manual § 12-I(A)(2), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (sincerity is undermined if the request "follows an earlier request by the employee for the same benefit for secular reasons").

To this, Stynchula offers nothing that could create a genuine issue as to her (in)sincerity. Stynchula says that she presumed that prior references to her Catholic background communicated her objection to abortion to Inova. ECF 77 at 15 (citing ECF 77-2 at Pl. Ex. 20 p. 167). While her

beliefs grounded in her Catholicism may well include an objection to abortion, courts have held that simply citing one's denomination—in a world where individual beliefs are idiosyncratic—is insufficient to communicate a specific objection to abortion. *See Flores v. Cook County*, 2024 WL 3398360, at *3 (N.D. Ill. July 11, 2024) (citing *Sch. Dist. of Abingdon Twp., Pa. v. Schempp*, 374 U.S. 203, 283 n.58 (1963)) ("[I]t would be a mistake . . . [to] presume[e] that all Christians share certain beliefs."); *Aliano v. Township of Maplewood*, 2023 WL 4398493, at *8 (D. N.J. July 7, 2023) (mere assertion of fetal cell line objection and separate identification of Catholic faith insufficiently connected anti-abortion beliefs to subjective religious beliefs); *Gardner-Alfred*, 2023 62148623, at *17 ('The priest advised her that 'it is not possible for a Catholic to claim an exemption from the [COVID-19] vaccination on religious grounds,' and that she could seek only 'a personal exemption on grounds of conscience.'"). Stynchula also asserts that she only started to "really try to articulate" all of her objections to the vaccines after the denial of her March 2022 requests because stating her "primary basis" for opposition had previously been sufficient. ECF 77 at 14–15 (citing ECF 77-2 at Pl. Ex. 20 p. 115). But the relevant undisputed facts only further undermine her sincerity. At her August 2024 deposition, Stynchula agreed that the beliefs she expressed in her March 2022 exemption requests, which did not include fetal cell line concerns, were "the ones [she] could articulate." ECF 66-7 at Def. Ex. 64 p. 101; *see also id.* ("[T]here's probably more if I went and got a Ph.D. in theology, I could probably explain my foundational beliefs better."). Despite now insisting on the strength of her abortion-related beliefs, Stynchula provides no account of why she could not articulate those concerns when asked about her religious beliefs at the deposition, which came *after* she articulated fetal cell line objections in her July 2022 appeal. Moreover, Stynchula's investigation of the Novavax vaccine—as she describes it—belies any claim that she made a meaningful effort to determine the existence of any connections between

the vaccine and fetal cell lines.[10] *See* ECF 66-7 at Def. Ex. 64 pp. 119–28. This, taken together with Stynchula's other objections, reasoning, and conduct, would not allow a reasonable juror to conclude that Stynchula's fetal cell line beliefs were "truly held." Rather, "[Stynchula's] belief that her religion barred her from taking a vaccine made with aborted human fetal cells appears to have been newly adopted only in response to the [final] demand that she take the Covid-19 vaccine." *Gardner-Alfred*, 2023 WL 6214863, at *17; *see* ECF 66-7 at Inova_Stynchula 0001061.

* * *

In sum, Stynchula may have "demonstrated that her convictions with respect to the Covid-19 vaccine are strongly held, but she has not demonstrated that they are religious." *Gardner-Alfred*, 2023 WL 6214863, at *17 (citing *Mason v. Gen. Brown Cent. School Dist.*, 851 F.2d 47, 52 (2d. Cir. 1988). Her claim fails for this and the independent reason that no reasonable juror could believe that her asserted religious fetal cell opposition to the COVID-19 vaccination was sincere.

### C.   Stynchula and Birke's Communicated Beliefs Did Not Conflict With Inova's Policy.

Inova next argues that both Stynchula and Birke's claims fail as a matter of law because there is no genuine dispute that they could have complied with both Inova's COVID vaccination policy and the religious beliefs they communicated once Novavax became available. This is because (1) they did not believe that Novavax offended their fetal cell line beliefs and voiced no concerns with Novavax after Inova presented the option to them, and (2) there is no admissible evidence establishing an issue of fact as to whether Novavax was in fact "tested" on fetal cell lines.

---

[10] It is undisputed that Stynchula's entire investigation consisted of reviewing the Novavax website, asking a pharmacist friend if they had seen the Novavax insert, and visiting one webpage linked in Inova's Novavax Overview. ECF 66-7 at Def. Ex. pp. 118, 120, 123, 126. While Stynchula was apparently unsatisfied, she did not ask anyone at Inova about whether fetal cell lines were involved in Novavax or for information on the Novavax fact sheet, did not ask to see the Inova – Novavax email correspondence referenced in the Overview, and did not discuss the Novavax vaccine with anyone apart from the pharmacist. *Id.* at Def. Ex. 64 pp. 118, 120, 121, 126, 127. There is no evidence that Stynchula made any further efforts on the matter.

These arguments are well-founded and entitle Inova to summary judgment on both Stynchula[11] and Birke's claims.

### 1. Neither Stynchula nor Birke Believed Novavax Offended Their Positions, Nor Did They Object to Novavax.

As part of his burden to establish a prima facie case, a plaintiff must show his sincere religious beliefs "conflict with an employment requirement," *Firestone Fibers & Textiles Co.*, 515 F.3d at 312, and "inform his employer of both his religious needs and his need for an accommodation." *Cary v. Anheuser-Busch, Inc.*, 116 F.3d 472, at *3 (4th Cir. 1997) (Table) (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 901 (7th Cir. 1978)); *Chalmers*, 101 F.3d at 1019. An employer does not have a duty to accommodate employee beliefs that are not in conflict with its policies. *See Dachman v. Shalala*, 9 F. App'x 186, 192 (4th Cir. 2001); *McCoy v. Cox Commc'ns*, 2024 U.S. Dist LEXIS 115911, at *7 (E.D. Va. Jan 22, 2024).

In her March 2022 exemption request, Birke objected to COVID vaccines on the ground that "most vaccines are made out of or tested using aborted fetal organs or cells and cell lines." SUMF ¶ 83; ECF 66-5 at Inova_Birke 0000897. Eleven days after Inova rejected this request on July 2, 2022 (with the invitation to provide additional supporting information—one that Birke never took up), the FDA approved the Novavax COVID vaccine on July 13, 2022, and there is no dispute that Birke could have complied with Inova policy by taking Novavax, which was accessible before her employment with Inova ultimately ended on September 30, 2022.  SUMF ¶¶ 24, 40, 90–93, 102; ECF 66-2 at Inova_COVID-19 0003056; *see also Ellison v. Inova Health Care Services*, __ F. Supp. 3d __, 2024 WL 1623102, at *6 (April 15, 2024). Not only that, but Inova specifically informed Birke by email on August 17, 2022 of Novavax's availability, its

---

[11] These arguments are each an independent ground for granting summary judgment as to Stynchula's claim, in addition to the fact that her relevant objections were not religious or sincerely held. *See supra* § III.B.

inclusion in the IPP, and its potential appeal to "individuals with concerns about existing vaccines" given the non-use of "human fetal-derived cell lines or tissue" in the "vaccine, adjuvanted, or [] in its development, manufacture, or release testing." SUMF ¶ 94; ECF 66-2 at Def. Ex. 18. More information, including Inova's Novavax overview, was linked in this email. *Id*. Then, on September 27, 2022, after repeatedly extending the deadline for Birke's compliance with the IPP, two Inova employees spoke with Birke on September 27 regarding compliance via Novavax without compromising Birke's beliefs on fetal cell lines, and later sent Birke a follow-up email with more details. SUMF ¶¶ 95, 97, 100.

Through all of this, Birke never communicated to Inova any objection to or concern with the Novavax vaccine, saying nothing about it at all. Birke did not respond to the follow-up email. SUMF ¶ 101. Birke, however, knew while she was still working at Inova that Novavax was available and that Inova was notifying employees that Novavax would be appealing for those with fetal cell objections. ECF 66-5 at Def. Ex. 42 pp. 158–59, 161. Despite such, Birke acknowledged at her deposition that she did "not really" consider the Novavax vaccine, *Id*. at 159, did not research it "because of [] the reputation of the vaccine companies and how they state their facts," *Id*. at 167, 169–70, did not know if "what they claim is true or not," and did not "have the luxury of time, I have to decide and move on." *Id*. at 168. That is, Birke *herself* did not believe that a conflict existed between her stated religious beliefs and Inova's IPP vis-a-vis the Novavax vaccine.[12]

As for Stynchula, her July 12, 2022 supplemental submission included objections specifically to the Moderna, AstraZeneca, and Johnson & Johnson COVID-19 vaccines based on

---

[12] Birke argues that she had no incentive to and was "disallowed" from voicing a religious objection to the Novavax vaccine because Inova notified Birke of its "final" decision on August 19, 2022, two days after it informed her of Novavax. ECF 77 at 45–46. However, no reasonable juror could believe that Birke was in fact dissuaded from informing Inova of an objection given her meeting with Mr. Tippett and Ms. Malkoun on September 27, 2022. SUMF ¶ 100; *see* ECF 66-5 at Def. Ex. 42 p. 163 (Birke stating she "probably" viewed YouTube vaccine video sent by Tippett because "He took his time to work with me, so I worked with him").

the use of "aborted fetal tissue" in the "development, production, and lab testing" of the latter two and the "testing process" in the former two. SUMF ¶ 123. The FDA approved the Novavax COVID-19 vaccine the very next day on July 13, 2022 and there is no dispute that Stynchula could comply with Inova policy by taking the Novavax vaccine, which was accessible before her employment with Inova ultimately ended on September 8, 2022.  SUMF ¶¶ 24, 40, 130; ECF 66-2 at Inova_COVID-19 0003056; *see also Ellison*, 2024 WL 1623102, at *6. Around the time that Inova informed Stynchula on August 5, 2022 that her exemption request had been denied and that she had until August 19, 2022 to initiate COVID-19 vaccination, she learned (by way of Inova's Novavax Overview) of Novavax's availability, its inclusion in Inova's IPP, and Inova / Novavax's statements that the vaccine did not involve fetal cell lines in its manufacture, development, or testing.[13] SUMF ¶ 125.

Despite reviewing Inova's Novavax Overview, Stynchula stated at her deposition that she "knew that Novavax had some fetal cell issues that [she] couldn't get clarification on" and was unsatisfied with the Overview's statements regarding the non-involvement of fetal cell lines because "I always read the inserts that are in the medications. I want to get the answers directly from the researchers and not from a third party[.]" ECF 66-7 at Def. Ex. 64 pp. 117–20. She wanted to see the Novavax fact sheet that the Overview quoted from because "you can take anything out of context." *Id*. at Def. Ex. 64 p. 120. She described herself as "digging all over trying to find clarification to see if [fetal cell lines] [were] involved in it or not." *Id*. at Def. Ex. 64 p. 118. Stynchula looked on the Novavax website for information, asked a pharmacist friend if they had seen the insert, and visited one webpage linked to in the Inova Overview. *Id*. at Def. Ex. 64 pp. 118, 120, 123, 126. However, she did not ask anyone at Inova about whether fetal cell lines were

---

[13] Inova informed Stynchula of the same by email once again on August 17, 2022. SUMF ¶ 128.

involved in Novavax or for information on the Novavax fact sheet, did not ask to see the Inova – Novavax email correspondence referenced in the Overview, and did not discuss the Novavax vaccine with anyone apart from the pharmacist. *Id*. at Def. Ex. 64 pp. 118, 120, 121, 126, 127. There is no evidence that Stynchula made any further efforts on the matter. Like Birke, Stynchula evidently did not actually know whether a conflict existed between her stated religious beliefs and Inova's IPP vis-a-vis the Novavax vaccine. And Stynchula too never informed Inova of any misgivings on Novavax, staying silent.[14] This was so even after she emailed Inova on August 23, 2022 to ask "what standard I do not meet" and was directed to the Inova IPP FAQs, "updated on August 16, 2022 to include Novavax information." ECF 84-6 at Inova_Stynchula 0001766.

The undisputed facts show that both Birke and Stynchula's conduct is insufficient as a matter of law to establish that their communicated religious beliefs conflicted with Inova's IPP. The Sixth Circuit's holding in *DeVore v. University of Kentucky Board of Trustees*, 118 F.4th 839 (6th Cir. 2024) is instructive here. There, plaintiff Laurie DeVore brought a Title VII claim against the University of Kentucky, alleging a failure to accommodate her sincerely held religious beliefs in refusing to exempt her from the University's requirement that employees either be vaccinated against COVID-19 or participate in mandatory weekly COVID testing. 118 F.4th at 846. In part, DeVore relayed objections to nasal COVID testing regarding "inflammation of the nasal passage" that could "damage the first line of defense God created mankind with." *Id*. The University offered her the alternatives of testing by oral swab or saliva, which DeVore insisted were "not reasonable in light of my religious concerns." *Id*. at 843. The University responded by explaining that it

---

[14] Like Birke, Stynchula argues that she had no incentive to and was "disallowed" from voicing a religious objection to the Novavax vaccine because Inova notified Stynchula of its "final" decision on August 5, 2022, the same day that the Inova Novavax Overview was emailed to her. ECF 77 at 45–46. However, no reasonable juror could believe that Stynchula was in fact dissuaded from informing Inova of an objection given that she, on her own initiative, emailed Inova on August 23, 2022 for reconsideration of her exemption request in a message bearing subject "Please consider." ECF 84-6 at Inova_Stynchula 0001767.

understood DeVore's testing objections to be specific to the invasive nature of the nasal swab test and that it had offered the alternative testing options to remedy that objection. *Id*. at 843–44. DeVore followed on, referring once again to her initial objection that "repeated testing can damage first line of defense God created mankind with . . . ." *Id*. at 846. But since DeVore admitted in her deposition that "there was no invasiveness regarding the saliva test," that she did not "know what was entailed in the oral swab test," and that she did not "research what the oral swab test entailed," the Sixth Circuit concluded that "DeVore has established no conflict between the Policy and any religious objections she may have had to invasive medical procedures." *Id*. at 846–47 (cleaned up). "These objections may have been enough to satisfy Title VII's pleading requirements. But they fail at summary judgment to establish a conflict between DeVore's religion and the Policy." *Id*. at 848.

The same can be said of Birke and Stynchula's stated objections. Inova offered the two plaintiffs an alternative vaccination option that it understood, based on its investigation of the Novavax vaccine and reliable statements made by Novavax both to the public and Inova specifically,[15] would squarely address their stated fetal cell line manufacturing and testing concerns. SUMF ¶¶ 41–46. Like DeVore, Birke simply did not know if the Novavax vaccine offended her fetal cell line beliefs in some way and she did not research Novavax to understand if it did. [16] And Stynchula is no different. While she contends awareness of Novavax's fetal cell line "issues," there is no relevant distinction between this unsupported assertion of "knowledge" and DeVore's uninformed insistence to her university that oral swab testing was "not reasonable in

---

[15] *See infra* § III.C.2.

[16] This is especially egregious on Birke's part, because even while both she and Stynchula agree that the pertinent question is whether "at the time of [their] suspension and termination [they] held religious beliefs in conflict with Inova's policy," she only claims to "*now* understand[] that Novavax was tested using fetal cells." ECF 77 at 46 (citing ECF 77-2 at Pl. Ex. 20 p. 207); SGDMF ¶ 26.

light of [her] religious concerns" and again "invasive." *DeVore*, 118 F.4th at 843, 846. Further, Stynchula's investigation of what the Novavax vaccine entailed was both evidently not directed towards understanding its fetal cell line associations and minimal.[17] At bottom, Stynchula too did not know if the Novavax vaccine transgressed her fetal cell line beliefs and did not meaningfully research Novavax to understand if it did. Both Birke and Stynchula "fail[ed] to account for the[] alternative[]," *Id.* at 848, and for this reason, their claims must fail for lack of conflict between their communicated religious beliefs and Inova's policies.

The only respect in which Birke and Stynchula's claims differ from the claim in *DeVore* weighs in favor of summary judgment. Unlike DeVore, Birke and Stynchula did not even bother to reassert their original objections to the COVID-19 vaccine in response to the Novavax option, electing silence instead. Before this Court, they now shoehorn their previously unstated objections to Novavax into the ostensible breadth of the word "testing," as stated in their exemption requests. SGMDF ¶ 26; ECF 77 at 43–44. But this focus is misguided. Plaintiffs' reliance on "testing" is similar to how DeVore's response to oral swab and saliva testing alternatives did not "introduce[] any new source of religious conflict" and in pertinent part, merely referenced her initial "invasiveness" objections. 118 F.4th at 843, 846–47. Confronted with that, the Sixth Circuit did not evaluate whether the "invasiveness" of oral swab testing is somehow akin to that of the "invasiveness" of nasal swab testing.[18] *See DeVore*, 118 F.4th at 846–47. And following a similar analytical approach, it is unnecessary for this Court to dissect the meaning of the word "testing."

---

[17] *See supra* § III.B.
[18] Notably, a COVID oral ("oropharyngeal") swab test involves using a "long Q-Tip" to take a sample from the middle part of the throat, beyond the mouth, such that it could be characterized by some as invasive and "damag[ing] the first line of defense God created mankind with." *See COVID-19 Test Basics*, FDA (Sept. 7, 2023), https://www.fda.gov/consumers/consumer-updates/covid-19-test-basics; *DeVore* 118 F. 4th at 846.

Plaintiffs also insist that Inova would have been aware of *their* religious objections to Novavax because *other* employees raised fetal cell line-based concerns. ECF 77 at 44. But what Inova knew about the beliefs of others is irrelevant to their knowledge of *Plaintiffs'* religious beliefs. *Aliano*, 2023 WL 4398493, at *10. Indeed, the fact that other employees *did* voice concerns in response to Inova's Novavax offer (precisely what Birke and Stynchula did not do) undermines Plaintiffs' case and demonstrates how the accommodations process is intended to work. Birke and Stynchula's position, in light of their failure to respond to Inova's offer of Novavax, would "charge [Inova] with the responsibility for continually searching for each potential religious [fetal cell line] conflict" of theirs, which accommodation is not so onerous as to do. *See Redmond v. GAF Corp.*, 574 F.2d 897, 902 (7th Cir. 1978). Their mute dismissal of the Novavax vaccine frustrates Inova's attempt at "cooperation in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Cary*, 116 F.3d at *3 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986)). So, for these reasons too, Birke and Stynchula's claims must fail.

### 2. No Evidence Supports the Contention that Novavax was "Tested" On Fetal Cell Lines Because Dr. Sherley's Opinion is Inadmissible.

As in *Ellison*, it is Plaintiffs' burden to "establish with admissible evidence that there is a genuine dispute on [Novavax's use of fetal cell lines in testing of its COVID-19 vaccine], as it is their burden to establish that their religious beliefs 'conflict with an employment requirement.'" *Ellison*, 2024 WL 1623102, at *6 (quoting *Firestone*, 515 F.3d at 312). In addition to the reasons described above, summary judgment is appropriate on Birke's and Stynchula's claims because they have not brought forth such evidence.

As recounted above, Novavax publicly stated that "[n]o human fetal-derived cell lines or tissue are contained in the Novavax COVID-19 Vaccine . . . or used in its development,

manufacture, or release testing (ECF 66-8 at Inova_COVID-19 0000252), and a Novavax research executive stated to Inova that any suggestions otherwise were "nonsense," saying that the "bottom line [i]s that no human cell lines have been used in the development, manufacture, testing, or release of the [Novavax] vaccine." (ECF 66-2 at Inova_COVID-19 0000245). *Ellison*, 2024 WL 1623102, at *6. "The Court finds these statements—made by press officials and the scientists who developed the vaccine at Novavax, a publicly traded company subject to securities laws—are admissible evidence under the residual hearsay exception because they have sufficient guarantees of trustworthiness and are 'more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.'" *Id.* (citing Fed. R. Evid. 807); *cf. Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1552 (9th Cir. 1989) (affirming trial court's admission of a public company's registration statement under the residual hearsay exception). Moreover, even if these statements were not admissible, it is still "*Plaintiffs'* burden to establish a genuine issue of fact as to whether the Novavax vaccine used fetal cell lines in testing to make out a *prima facie* claim—not *Inova's* burden to prove otherwise." *Ellison*, 2024 WL 1623102, at *6. (emphasis in original) (citing Fed. R. Civ. P. 56(c)(1)(B) (explaining that a movant for summary judgment may support its assertion that there is no genuine issue of material fact by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact")).

In an effort to contradict these statements, Birke and Stynchula offer the expert report of Dr. James Sherley. Dr. Sherley is a physician-scientist whose opines that the Novavax vaccine "was tested in the post-production phase using abortion derived fetal cell liens" and "aborted fetal cells were substantially involved in the quality testing of Novavax vaccine, albeit not in its

development or manufacturing processes." ECF 66-8 at Def. Ex. 84 ¶¶ 12, 18. However, Dr.

Sherley's opinions fall outside the scope of his expertise and are irrelevant and unreliable and thus

inadmissible.

Under Federal Rule of Evidence 702, testimony by a witness qualified as an expert by

knowledge, skill, experience, training, or education is admissible only if its proponent

demonstrates by a preponderance that: (a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)

the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert's opinion reflects a reliable application of the principles

and methods to the facts of the case. Fed. R. Evid. 702; *see* Fed. R. Evid. 104(a); *Daubert v. Merrell

Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.10 (1993). The Court's role is to act as a

gatekeeper to "ensure that an expert's testimony both rests on a reliable foundation and is relevant

to the task at hand." *T.H.E. Insurance Company v. Davis*, 54 F.4th 805, 822 (4th Cir. 2022)

(cleaned up) (quoting *Daubert*, 509 U.S. at 597). So "'[w]hen a party challenges an opposing

expert's testimony as irrelevant [or unreliable], the court must satisfy itself that the proffered

testimony' meets the relevant standard as a 'precondition to admissibility.'" *Snell v. Reid*, 2024

WL 2815061, at *3 (4th Cir. June 3, 2024) (Table) (quoting *Sardis v. Overhead Door Corp.*, 10

F.4th 268, 282 (4th Cir. 2021)). Further, an expert must have the specialized knowledge or skill in

the specific area in which the testimony is proffered: "if an expert is not qualified in the first place,

the court's gatekeeper function . . . mandates exclusion of his/her testimony in that area of non-

expertise." *Norman v. Leonard's Express, Inc.*, 2023 WL 3034606, at *3 (W.D. Va. April 21,

2023) (citing *Smith v. Wyeth-Ayerst Lab'ys Co.*, 279 F. Supp. 2d 684, 698 (W.D.N.C. 2003)); *Kopf

v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993); *see also Gladhill v. General Motors Corp.*, 743 F.2d

1049, 1052 (4th Cir. 1984) ("Whether a witness is qualified can only be determined by the nature of the opinion he offers").

Inova challenges Dr. Sherley's opinion on the testing of the Novavax vaccine as irrelevant to Birke and Stynchula's expressed beliefs, citing his unfamiliarity with their exemption requests, employment circumstances, or even their identities. ECF 66 at 57–58 (citing *Garlinger v. Hardee's Food Systems, Inc.*, 16 F. Appx. 232, 234 (4th Cir. 2001) ("The consideration of relevance requires the district court to determine whether the testimony 'fits the instant case; not all *reliable* testimony is *relevant* expert testimony'")). This objection is misplaced. The pertinent issue is "whether Novavax used fetal cell lines in the development or testing of its COVID-19 vaccine," *Ellison*, 2024 WL 1623102, at *6, which, at this stage, is not contingent on the particulars of Plaintiffs' circumstances (beyond their stated fetal cell line objections). Sherley claimed to respond to the medical issue of "whether the Novavax vaccine was involved in the use of aborted fetal cell lines, whether in the development, manufacture, or testing phases." ECF 66-8 at Def. Ex. 84 ¶ 11. That he purported to address a "hypothetical question" is not itself improper. *See United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011) ("It is well established that experts may offer opinions based on hypothetical questions proposed by the attorneys questioning them."); Fed. R. Evid. 703.

However, Dr. Sherley's opinion *is* irrelevant because he never answers the question of "whether Novavax used fetal cell lines in the development or testing of its COVID-19 vaccine." Dr. Sherley, in his own words, understood his task to be a very different one: in his reply report, he states that "my report . . . *focused* on whether cell lines derived from electively aborted human children were *sufficiently involved* in the development of the Novavax vaccine *to give religious persons a justifiable basis for declining the vaccine*." ECF 66-8 at Def. Ex. 85 ¶ 8 (emphasis added). He further asserts that "the *critical point* made in my initial report" was that "it is

*reasonable and justifiable for a person who does not wish to use a vaccine* developed [by a company that supported and subsidized a project that contributed to the development of the vaccine by testing it with cell lines derived from an electively aborted child] to decline it. *Id*. at Def. Ex. 85 ¶ 11 (emphasis added); *see also Id*. at Def. Ex. 84 ¶ 10 ("[U]sing cells derived from aborted human beings of fetal age . . . makes vaccination with those vaccines an *impermissible trespass* for individuals whose *religious beliefs dictate that abortion of a human life is wrong*, immoral, and not allowed within their faith."). These matters are plainly irrelevant to the objective question at issue. Indeed, this Court has already rejected the idea that "all that matters is that [Plaintiffs] 'have reasonably assessed that the Novavax vaccine has too much of an association with abortion to be compatible with their religious beliefs.'" *Ellison*, 2024 WL 1623102, at *7.

In addition to being irrelevant, Dr. Sherley's opinion lies beyond the scope of his expertise and is inadmissible. By his own account, the opinion is neither scientific, technical, or medical. But Plaintiffs have presented nothing to establish that Dr. Sherley has any basis or ability to pronounce what is "reasonable" or "justifiable" or "impermissible trespass" for a "religious person" (the religion of whom is entirely unknown). *Cf. In re Terrorist Attacks on September 11, 2001*, 2023 WL 3116763, at *5 (S.D.N.Y. April 27, 2023) ("[N]either a pig farmer nor a biologist could explain to a jury what food is haram."). Plaintiffs acknowledge as much, noting that "Dr. Sherley is not an expert in religious beliefs or employment decisions." ECF 77 at 50. The threadbare character of Dr. Sherley's opinion, which dovetails with its unreliability, also renders it impossible for this Court to say that the "nature of the opinion he offers" is markedly scientific or technical and not an essentially theological.

Lastly, Dr. Sherley's opinion is not founded upon "sufficient facts or data," nor does it "reflect[] a reliable application of [reliable] principles and methods to the facts of the case." Fed.

R. Evid. 702(b), (c). To form his opinion, Dr. Sherley relied on an article from Science magazine and its supplement. ECF 66-8 at Def. Ex. 84 ¶ 14.[19] Reviewing these sources, he arrived at the conclusion "[i]n light of" (1) the Bangaru Article's description of comparisons made "at the prerogative of Novavax" of Novavax-produced spike proteins and data on spike proteins derived from fetal cell lines; (2) the Bangaru Article and Supplement's description of use of a pseudovirus produced in part with fetal cell lines; and (3) the Bangaru Article's funding statement. ECF 66-8 at Def. Ex. 64 ¶ 15–18. On the funding statement, Sherley declared that" Novavax acknowledged that some or all of those tests, which utilized fetal cell lines, were paid for by Novavax Inc," that "Novavax relied on that testing in the process of bringing the vaccine to market," and that "[u]nder market and industry standards, it is reasonable to conclude that this testing was integral to the FDA approval and marketability of the Novavax vaccine as it was offered to the public." *Id.*

While the reliability of the Bangaru Article and Supplement themselves is uncontested, there are significant issues with Sherley's treatment of the funding statement, which Sherley himself acknowledges as foundational to his conclusions. ECF 77 at 51; *see* ECF 66-8 at Def. Ex. 64 ¶ 18; *Id.* at Def. Ex. 65 ¶ 11. Nowhere in the Bangaru Article or Supplement is it established that "Novavax relied on [the Bangaru testing] in the process of bringing the vaccine to market." Nor does the fact that Novavax was listed as one of three funders (along with NIAID and the Bill and Melinda Gates Foundation, SUMF ¶ 109) in the Bangaru funding statement establish that Novavax sponsored or funded the study's utilization of fetal cell lines. Nevertheless, Sherley takes this to establish the "reasonable[ness]" under "market and industry standards" of concluding that

---

[19] Citing Sandhya Bangaru, et al, *Structural analysis of full length SARS-CoV-2 spike protein from an advanced vaccine candidate*, 370:6520 SCIENCE 1089-1094 (Oct. 20, 2020) [hereinafter "Bangaru Article"]; Sandhya Bangaru, et al, *Supplementary Materials for Structural analysis of full length SARS-CoV-2 spike protein from an advanced vaccine candidate*, SCIENCE (Oct. 20, 2020) [hereinafter "Bangaru Supplement"], https://www.science.org/action/downloadSupplement?doi=10.1126%2Fscience.abe1502&file=abe1502_bangaru_sm.pdf).

the Bangaru study was "integral" to the regulatory approval and marketability of the Novavax vaccine. But Sherley undermines his reliability by entirely failing to explain "how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *Plantan v. Smith*, 2021 WL 3048648, at *13 (E.D. Va. June 18, 2024) (cleaned up); *see also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

Dr. Sherley's reply report, if it were also considered, only underscores that the insurmountable issue here is that the Bangaru Article and Supplement simply do not provide sufficient information to allow Sherley to draw reliable conclusions. To support his "industry standards" conclusion and the suggestion that Bangaru's study was used in bringing Novavax to market, Sherley posits that "the two most essential elements of the FDA drug approval process are safety testing and efficacy testing." ECF 66-8 at Def. Ex. 65 ¶ 9. This may very well be true, but it cannot be reliably applied here. Sherley's assertion that the Bangaru study was "being performed for the purpose of evaluating the potential efficacy of the vaccine for regulatory approval and public use" is based solely on the fact that the Bangaru Article was published three years prior to Novavax's final approval in 2023, which amounts to nothing more than rank speculation. Nothing in the Bangaru Article and Supplement gives any suggestion as to what greater purpose the Bangaru study served or its involvement in Novavax's approval or marketing. Similarly, Dr. Sherley clarifies the significance of Novavax's funding, asserting that "unless funding is specifically restricted [] within a funding grant, all funds of the grant are unrestricted, and are available to support any and all analyses in a designated research project." *Id*. at Def. Ex. 65 ¶ 10. This too may be a valid principle, although it is again inapplicable. Dr. Sherley declares Novavax placed no fetal cell restrictions on its funding contributions, "[b]ased on the materials available."

*Id.* This overlooks the fact that the Bangaru Article is six pages long and dedicates precisely <u>two</u> <u>sentences</u> to the issue of funding, while the supplement has nothing to say on the matter. Nothing of import can be drawn from what these materials, by all indications created for purely academic and scientific ends and not to answer the question Sherley imposes upon them, do not say.

Dr. Sherley did not rely on sufficient evidence regarding the funding and purpose of the Bangaru study in opining that "aborted fetal cell lines were substantially involved" in Novavax's quality testing. While he is not necessarily obligated to root his opinion on Novavax's data on file regarding its vaccine (the basis for its assertions that fetal cell lines were not used in its vaccine's development, manufacture, or release testing, ECF 66-8 at Inova_COVID-19 0000252), it is telling that he did not even attempt to review it (SUMF p. 29 ¶ 110), limits himself to an extremely narrow universe of resources, and attempts to bridge gaps with conclusory and speculative conjecture. *See Smith v. Ill. Dep't of Trans.*, 936 F.3d 554, 558–59 (7th Cir. 2019) (expert opinion called into "significant doubt" by "omi[ssion] [of] a substantial set of facts from her analysis" and reliance on "plaintiff-curated records"); *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (expert's attempt to apply "general engineering principles" dependent on "imperfect syllogism constructed from unsupported suppositions" not sufficiently reliable). While Sherley may "extrapolate from existing data," the factual basis here is so inadequate that it is connected to Sherley's opinion only by his *ipse dixit*. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Because on the foregoing grounds Dr. Sherley's opinion is not admissible, Birke and Stynchula have done no more than claim "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they have failed to establish a genuine dispute as to whether the Novavax vaccine used fetal cell testing in its development. Accordingly, they cannot satisfy the first element of their prima facie claim: that

their religious beliefs conflicted with the IPP. Inova is therefore again entitled to summary judgment as to both Birke and Stynchula.

## IV.     CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motions for Summary Judgment in appropriate orders to accompany this memorandum opinion.

/s/

_____

Michael S. Nachmanoff
United States District Judge

November 19, 2024
Alexandria, Virginia